JAMES H. RING, APPELLANT, v. FRANCIS W. BROWN, APPELLEE.

FILED JUNE 11, 1909.    No. 15,735.

1. **Corporations: CONTRACT WITH MANAGER: LIABILITY.** One who takes over the management of the business of a corporation under an agreement by which he has an option to purchase a controlling interest in its capital stock within a given time for a nominal consideration, and agrees to use his best endeavors to make its business pay and put value into its stock, in the absence of fraud

or mismanagement, is not liable for a failure to make its business profitable.

2. **Evidence** examined, its substance stated in the opinion, and *held* to be sufficient to sustain the judgment of the trial court.

APPEAL from the district court for Lancaster county: LINCOLN FROST, JUDGE. *Affirmed.*

*J. H. Broady, Jr.,* and *Hugh LaMaster,* for appellant.

*Strode & Strode, contra.*

BARNES, J.

Prior to the 2d day of August, 1902, the plaintiff was engaged in operating a planing mill in the city of Lincoln, under the name of the National Manufacturing Company, a corporation, of which he was the president and the owner of all of its capital stock. For many years he had been a preacher of the gospel and a farmer, and therefore knew nothing whatever about the planing mill business. The mill proved a losing venture for him, and at the date above mentioned he had become involved in debt, and the concern was without credit. In order to continue the business, he entered into a contract with the defendant by which he agreed to deliver to one P. L. Hall 63 shares of the capital stock of the corporation in escrow, to be delivered by Hall to the defendant, at his option, at any time within $3\frac{1}{2}$ years from the date of the contract upon the payment by the defendant of $1 to said Hall. In consideration of the delivery of the stock in escrow, the defendant undertook the management of the planing mill, and agreed to give his best service to the business in order to place it upon a paying basis, liquidate the indebtedness of the concern, and put value into its stock. It was further agreed that, if the defendant did not wish to proceed with said contract, he could cancel it at any time during its life without incurring any liability thereby. Thereupon the defendant took over the management of the plant, and he, together with the plaintiff,

employed one Harper, a person conceded to be experienced in that line of business and thoroughly competent to conduct it, as foreman and manager of the concern. It appears that the business was thereafter conducted at a loss until June 27, 1903, when a second contract was entered into, which recited that the indebtedness of the company was then about $11,000; that the plaintiff held a claim of about $3,500 against the corporation, and, in order to induce the defendant to continue the business of the company, it was agreed that the payment of plaintiff's claim should be postponed until all the balance of the indebtedness of the concern was paid. The intention and purpose, as expressed, was to subject the property of the company to the payment of its debts then due, or which should thereafter be incurred in the management of its affairs by the defendant, prior to the indebtedness due the plaintiff. After making the second contract, defendant continued in charge of the plant until January, 1904, when defendant decided not to exercise his option, and the mill was closed down. It was not thereafter reopened for business. The plaintiff thereupon instituted this action for an accounting, and prayed for a judgment against the defendant for the amount which should be found due him thereon.

Defendant's answer denied all of the allegations of mismanagement contained in the plaintiff's petition; alleged that he had conducted the business fairly and to the best of his ability; that it was a losing venture from the first; that he had expended of his own money something over $12,000 for the benefit of the plaintiff, for the payment of the corporate debts and to keep the mill running. He also prayed for an accounting, and for a judgment on his counterclaim for the amount that should be found due him thereon.

After the issues were joined, the case was referred, by agreement of the parties, to Edwin R. Mockett as a referee to take the testimony and report his findings of facts thereon. In due time the referee made his report

by which he found generally for the defendant. He also found that the plaintiff was indebted to the defendant in the sum of $2,684, and that the defendant was indebted to the plaintiff in the sum of $435, leaving a balance due to the defendant of $2,249, for which sum the defendant had judgment, and the plaintiff has appealed.

As a basis for recovery, the plaintiff alleged that the defendant under the contracts above described became a trustee for the corporation; that he was conducting a lumber yard and a planing mill in Lincoln on his own account; that he purposely and wilfully mismanaged the business of the National Manufacturing Company, and sold to it the odds, ends and culls of his own business at exorbitant prices; that he wilfully and intentionally conducted the affairs of the National Manufacturing Company in such a manner as to wreck the business; that he had violated his duties as a trustee and defrauded the company, and that the losses of the company were due to his unlawful conduct. The findings of the referee were against the plaintiff on these points, and he now contends that they are not sustained by the evidence, and that the judgment of the district court is contrary to law. This contention has made it necessary for us to read the bill of exceptions, which consists of about 500 type-written pages. This we have carefully done, and we find from the examination of the evidence that the National Manufacturing Company was organized in the fall of 1901, and commenced business in the latter part of November or early part of December of that year; that the plaintiff was not at that time directly interested in the plant; that his son, one C. B. Ring, had taken stock in the company to the amount of about $1,500; that one Stevens and one Burdine had taken 50 and 12 shares of the stock, respectively, and that there were 92 shares of stock of $100 each originally issued. Of this amount 50 shares were issued to Stevens and 12 shares to Burdine in consideration of a certain patented weather strip, and that no money was paid for those shares; that from the time the plant was

opened in December until February 12, 1902, the plaintiff had advanced about $6,000 to the plant in order to keep it going; that on February 12 he was persuaded to take stock in the company in satisfaction of the money he had advanced, and he thereupon became a stockholder of the company and its president, and from that date until July 12, 1902, managed and directed its business; that from February 12, under plaintiff's management, the capital stock suffered an impairment of $6,083.22, and from July 12 to August 2, 1902, a further impairment of $1,309.10, so that from February 12 until August 2, 1902, the company had suffered a loss of $7,392.32; that the company at that time was practically insolvent, and, having no credit, it was therefore unable to continue in business. The defendant undertook the management of the business August 2, 1902, and closed the plant about January 1, 1904; that, notwithstanding the defendant's endeavors to operate the plant on a paying basis, it suffered a loss of about $500 a month during that time. It further appears that the defendant did not have the exclusive control and management of the business, for, as above stated, he employed Harper at the instance of the plaintiff as foreman and manager of the business; that the plaintiff's son was secretary of the company; that his daughter was employed as its bookkeeper, and that the plaintiff also had employment therein as a collector. According to the testimony of the foreman Harper, who was called as a witness for the plaintiff, the defendant managed the affairs of the company as well as he could under all the circumstances; that the reasons for his failure to make the business pay was that the plant was unfavorably located; that it was not properly constructed and equipped; that it was an expensive one to run; that the company had no assets or means with which to buy its material at wholesale or to discount its bills, and it was therefore compelled to purchase its material at retail and in small quantities wherever such material could be

obtained; that the plant was managed as well as its construction, equipment and the situation permitted, but owing to strong competition, together with the facts above stated, it was impossible to conduct the business without loss.

Again, we find no competent evidence in the record which shows, or tends to show, that the defendant in managing the business discriminated against it in favor of his own lumber yard and planing mill. In fact the plaintiff failed to establish by competent evidence any of the material allegations of his petition. On the other hand, it appears that the defendant furnished material from his lumber yard to carry on the business; that he paid the running expenses of the concern from his own means; that he paid some of the debts of the corporation, advancing money for those purposes, amounting to about $12,000. It also clearly appears that at the conclusion of the business, and when defendant was compelled to close up the plant, to prevent further loss, the plaintiff was indebted to him in the amount found due by the referee, and was entitled to the credit so found for some of the machinery which defendant had taken out of the plant, with plaintiff's consent, leaving the balance due to defendant for which the trial court rendered judgment in his favor. It further appears that the defendant never received any compensation for his services; that he endeavored to make the plant pay, and put value into its stock, for which he had the option, thus hoping to compensate himself for his labor; but, failing to accomplish his purpose, he refused to exercise his option and take the stock which had been placed for him in escrow, and that he closed up the business and refused to reopen the mill for the sole purpose of preventing further loss. It also appears that he never refused to account to the plaintiff or the corporation; that the books were always open to plaintiff's inspection; that plaintiff was furnished employment in the plant; that his daughter was its bookkeeper; that his son was its secretary, and that there was never

any fraud or concealment practiced by the defendant in conducting the business.

It is further claimed that the defendant agreed to pay all the indebtedness of the corporation; that he failed and neglected to do so, and thereby violated his agreement, and that this furnished the plaintiff a basis for recovery. Upon this point the referee also found against him, and we think correctly so. We fail to find any consideration for such a promise, and it clearly and distinctly appears that, when the defendant took charge of the concern, it was with the express agreement and understanding that he was not to become personally liable for its debts.

We are therefore of opinion that the judgment of the district court was right, and it is in all things

AFFIRMED.